IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 1, 2013

## SHARON CLAYMAN SITZ v. WILLIAM GRANT SITZ

**Appeal from the Chancery Court for Sullivan County**
**No. K0036800(C)      E.G. Moody, Chancellor**

_____

**No. E2012-01726-COA-R3-CV-FILED-SEPTEMBER 30, 2013**

_____

After some 16 years of marriage, Sharon Clayman Sitz ("Wife") sued William Grant Sitz ("Husband") for divorce. Following a bench trial, the court awarded Wife a divorce on the ground of inappropriate marital conduct. The court adopted Wife's proposed parenting plan, which made Wife the primary residential parent of their minor child and divided the marital property. The court further determined that Husband was voluntarily underemployed and imputed additional income to him in order to calculate his child support obligation. Husband appeals. We affirm with one modification.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

William Grant Sitz, Kingsport, Tennessee, appellant, Pro se.

George K. Samuel and Katherine W. Singleton, Kingsport, Tennessee, for the appellee, Sharon Clayman Sitz.

**OPINION**

I.

Husband and Wife were married in October 1993. Their only child, Zane, was born in 1999. In January 2010, Wife filed for divorce. The parties separated a week after the filing. At the time of trial, Zane was 12. Husband and Wife were 55, and 50, respectively.

Husband holds degrees in chemical and civil engineering. When the parties married, he had worked as a plant manager for Cypress Foote Mineral Company, in nearby Duffield, Virginia, for five years. He earned approximately $47,000 a year. In 1994, the company was sold, the plant relocated to Nevada, and Husband was terminated. Husband said he passed up other potential jobs with the company largely because Wife couldn't handle the thought of moving out of state. Wife admitted she cried when Husband approached her about relocating.

In 1995, Husband started an engineering consulting firm. Over the next several years, his self-employment income steadily declined. After Zane was born, Husband worked even less on engineering projects. Husband always reflected a loss from his business on his tax return. In the Fall of 2006, Husband, in order to supplement his income, accepted temporary employment. He worked for about five months as a consulting engineer for Think Resources, Inc., in Greeneville. For his work, he earned some $18,000 in 2006, and $8,000 in 2007. By 2010, Husband's income was almost zero; he closed his firm. That year, Husband worked during the summer as a census taker and during the holidays for UPS. He did not work again until September 2011, when he obtained a part-time job with Walmart as a service writer. Husband described taking in customers' vehicles and writing up service orders as hard "grunt work" that paid him less than $8 an hour. He did not have a set schedule which, in turn, caused him to miss some time with Zane.

Wife worked full-time as a pharmacy materials manager at Indian Path Medical Center where she had been employed for nearly 25 years. She earned close to $30,000 a year. Wife paid for the family's health insurance. Her take-home pay was $376.07 a week. Wife's former supervisor described Wife as a good worker and a "compassionate, caring, . . . and patient" person. A co-worker testified Wife and Zane had a loving relationship.

Pre-marriage, Husband owned the house that later became the marital home. A year into the marriage, Wife took $32,000 from a CD she and her father owned and applied it to pay down the existing mortgage on the house. In return, Husband executed a deed to Wife so that thereafter title was held in their names as tenants by the entirety. Its appraised value was $117,500. The parties also purchased an adjacent lot, worth $14,000, and a time-share condominium in Florida. None of the property was encumbered. By 1996, the parties were debt-free.

When Zane was an infant, Husband remained self-employed. He also cared for Zane during the daytime, as did Wife's parents who kept him two to three days a week. Wife took over when she came home from work, particularly if Husband had any work to do. She admitted that, because she worked, Husband stayed with Zane if the child was sick or otherwise home from school. Husband said he took care of Zane with very little help from

Wife. Wife noted that Zane was in daycare from the time he was two until he started kindergarten.

After the separation, Wife moved out of the marital home. Her father purchased her a condominium where she and Zane lived. She paid $500 a month in rent to her father under a written lease agreement. Husband remained in the marital home. Under the initial temporary parenting plan, Wife was the primary custodian and Husband had parenting time every other weekend. Husband's temporary child support obligation was initially set at $863 based on his earnings at Think Resources, his last full-time engineering employment. Following mediation, the parties agreed that, pending trial, Husband's temporary monthly child support payment would be reduced to $526.[1] Further, Husband received additional parenting time during two afternoons each week. On other matters, the parties attended mediation four times with little success. Neither party sought an award of alimony. Pending trial, Husband accrued a child support arrearage of over $5,000. The trial court found him in contempt and Husband went to jail. At the time of the trial, Husband was current on his child support obligation.

Wife testified that she wanted a divorce because she could no longer live with the many "rules" Husband instituted in their home. Many of the rules resulted from Husband's efforts to keep down utility costs. Wife gave several examples: Husband turned off the water to the toilets and saved the water after everyone bathed to use to flush the toilets. He required that the hot water heater be kept "off" until just before showers were taken; afterwards, it was immediately turned off again. Husband took showers with Zane to conserve water. In addition, Husband kept the air conditioning turned up in the summer. According to Wife, it became so hot that she became nauseated and sometimes wore a bathing suit in the house. Husband and Zane wore only their underwear. In the winter, everyone wore double layers of clothing – even to bed – because Husband would not keep the heat on. The lights could not remain on. Husband required that the curtains stay closed so that no one could look inside the house. The cable box could only be on while someone was watching a show. Husband did not allow Wife to use the stove or oven during the summer months. He permitted Wife to run the microwave no longer than four minutes at a time. Husband timed her when she used the blow dryer. Husband did not allow Wife to use the dishwasher or the clothes dryer. Instead, he hung wet clothes "all over" the house – on doorknobs, over chairs and curtain rods to dry. He fashioned hooks from wire coat hangers, which he used to dry their underwear and socks outside. Wife said she complained about the rules and resulting living conditions, but Husband largely ignored her. She claimed he was "persistent to keep everything – all these rules a-going." Wife further testified to Husband's

---

[1]The payment is based on the imputed annual gross income of a male parent in Tennessee under the Child Support Guidelines. *See* Tenn. Comp. R. & Regs., ch. 1240-2-4-.04(3)(a)(2)(iv)(I)(III).

insistence that, like Zane, he and Wife go to sleep every night at 7:00 p.m. At a pre-trial hearing, Husband testified, "it's my house, my rules." At trial, he clarified that Wife was simply "outvoted" regarding control of the thermostat.

Husband testified that, before the parties separated, the majority of Zane's time was with him. Husband calculated that he should receive, not pay, child support. As to the conditions in the marital home, Husband explained that he was always an active supporter of energy and water conservation. He countered that Wife complained even when the house was at room temperature. He said that Wife had a "bizarre control thing" of her own, evidenced by the "mind boggling" things she wanted done at his house – limiting Zane's time to play video games, restricting his choice of television shows, forcing him to go out of the house, etc. He conceded that Zane played video games, some with a "mature" rating, but noted he had encouraged other activities such as baseball, art, and music. He was unaware of any hygiene concerns or needs Zane had. Husband testified generally that the opinions of Zane's therapist and others about life in his house were not valid because they had never observed how he lived. Husband said that, regarding Zane, Wife "just defied anything [Husband] wanted to do."

Both parties underwent a court-ordered psychological evaluation by Dr. David Cantor, a clinical psychologist. He saw both parties for three sessions. Generally, Dr. Cantor found Wife to be "friendly [and] cooperative." Husband was cooperative, but appeared "suspicious and cautious" and maintained a loud, angry voice. Based on clinical interviews and psychological testing, Dr. Cantor concluded that neither Husband nor Wife had a diagnosable psychological or mental disorder.

In mediation, the parties agreed that Zane would see a therapist. In June 2010, he began going once a month to Sybil Smith, a licensed professional counselor. By the time of trial, Ms. Smith had seen Zane 25 to 30 times. She also met with Husband and Wife together, separately, and with Zane. Ms. Smith testified she was working with Zane to improve his social skills and confidence, and to decrease his anxiety. She believed they were making progress and that Zane would continue to improve and benefit from continued therapy. Ms. Smith testified that she had reviewed both parents' proposed permanent parenting plans. She supported Wife's plan as being in Zane's best interest.

Dr. Judy Millington, a clinical psychologist, testified for Husband. Dr. Millington had one session with Husband and one with Husband and Zane. She was unable in that short time to form an opinion regarding the issue of child custody, but testified regarding her observations of Husband and Zane. She said that Husband clearly wanted a connection with Zane and valued the child's education. As to their relationship, Dr. Millington noted that Husband and Zane sat on opposite ends of the couch in her office. Zane looked "very

uncomfortable." When the child began to cry at one point, Husband continued talking about other topics for a time. Then Husband "teared up," which caused Zane to appear scared. Dr. Millington concluded that "some work could be done on the relationship between father and son to make things much more comfortable." Regarding Ms. Smith's opinion that Wife should have primary custody, Dr. Millington testified she had "no data to see otherwise." Dr. Millington diagnosed Husband as having a mild "adjustment disorder" with anxiety about what was going to happen with Zane in the divorce. She concluded that Zane had a generalized anxiety disorder – he worried about every aspect of his life and was "as tense as can be." She testified that Zane perceived Husband as someone to be followed and revered, but also one to be a "bit scared of." She concluded Zane "clearly loves [Husband]," but said he was "comfortable" with Wife, where there were less rules.

The trial court granted Wife an absolute divorce on the ground of inappropriate marital conduct. The trial court adopted Wife's proposed permanent parenting plan. Under the plan, Wife was made the primary residential parent and Husband was granted parenting time every other weekend and one afternoon a week. The court found that Husband was voluntarily underemployed and imputed to him a gross income of $6,608.75 a month for child support purposes. Husband's child support payments were set at $898 a month. The court found that Wife's proposed property division was equitable and incorporated it into the judgment. The court awarded Wife a portion of her attorney's fees and court costs. Husband filed a timely notice of appeal.

II.

Husband raises issues for our review that we restate as follows:

1. Whether the permanent parenting plan is in the best interest of the Child.

2. Whether the trial court erred in finding that Husband is voluntarily underemployed.

3. Whether the trial court erred in its calculation of Husband's imputed income.

4. Whether the trial court erred in granting Wife a divorce based on its finding of inappropriate marital conduct by Husband.

5. Whether the trial court prematurely entered its judgment of divorce before resolving all issues related to the division of the marital assets.

6. Whether the trial court erred in its award of attorney fees to Wife.

III.

With regard to all issues, our review is de novo upon the record of the proceedings below. However, that record comes to us with a presumption that the trial judge's factual findings are correct. Tenn. R. App. P. 13(d). We must honor this presumption unless we find that the evidence preponderates against those findings. *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). There is no presumption of correctness with respect to the trial court's conclusions on matters of law, *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005), or with respect to its application of the law to the facts. *State v. Thacker*, 164 S.W.3d 208, 247-48 (Tenn. 2005).

"Trial courts are vested with broad discretion in matters of divorce and child custody, and appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Whitaker v. Whitaker*, 957 S.W.2d 834, 836-37 (Tenn. Ct. App. 1997)(citing *Mimms v. Mimms*, 780 S.W.2d 739, 744-45 (Tenn. Ct. App. 1989)). The court's discretion extends to framing parenting plans and choosing primary residential parents. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). We review these determinations under an abuse of discretion standard whereby a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Furthermore,"when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *State v. Robbins*, No. W2004-00487-COA-R3-PT, 2004 WL 2715334 at *11 (Tenn. Ct. App. W.S., filed Nov. 18, 2004)(citing *McCaleb v. Saturn Corp*., 910 S.W.2d 412 (Tenn. 1995); *Whitaker*, 957 S.W.2d at 837).

IV.

Husband challenges the trial court's adoption of the permanent parenting plan proposed by Wife. Husband essentially contends that Wife used the parenting plan as a legal means of "kidnapping" Zane in the divorce. Husband asserts that although he "raised" the child, Wife, beginning with the temporary plan she submitted, took over the majority of the time with Zane. Husband reasoned that Wife thereby "reversed" the "parenting schedule" which the parties followed during the marriage. As Husband sees it, there was no basis to adopt Wife's proposed temporary plan or the permanent plan that further decreased his parenting time. Husband testified, "I raised him from the time he was a child, no one ever complained about the way I raised him until my wife filed for divorce."

In the present case, the permanent parenting plan made Wife the primary residential parent. She was also granted major decision-making authority regarding Zane's education, non-emergency medical issues, religious upbringing, and extracurricular activities. The parenting time was divided 285 days to Wife and 80 days to Husband. Father was granted standard parenting time every other weekend, from Friday afternoon until Sunday evening; and every Tuesday afternoon from 4:00 p.m. until 8:00 p.m. Holidays, special occasions and the child's spring and winter breaks were equally divided. During the summer months, the regular day-to-day schedule applied, except that each party would receive two weeks of vacation time. Special provisions in the plan required that Zane continue counseling with Ms. Smith; that Zane have uninterrupted participation in his extracurricular activities; and that the parties follow specific "rules of behavior." In particular, the parties were required to maintain a temperature between 68 degrees and 72 degrees at all times in their respective homes, keep the hot water heater and toilets "on," and not bathe or shower with the child, among other provisions.

With respect to child custody determinations, this Court has observed that courts "should promote children's best interests by placing them in an environment that will best serve their physical and emotional needs." *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001)(quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996)). Tenn. Code Ann. § 36-6-106(a)(2010) sets out factors relevant to a court's custody determination. They include, in relevant part, the following:

> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;
>
> (2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other

necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . . .

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers.

(6) The home, school and community record of the child;

(7) (A) The reasonable preference of the child, if twelve (12) years of age or older[2];

* * *

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . . .

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

In addition to the statutory factors, trial courts take into account a number of other factors, "including the parents' demeanor and credibility during the divorce proceedings themselves." *Nelson*, 66 S.W.3d at 901 (citing *Gaskill*, 936 S.W.2d at 631).

---

[2]The trial court declined to allow Zane to testify at trial.

As we earlier noted, the trial court made Wife the primary residential parent and provided for Husband's parenting time every week. Husband contends that the trial court thereby failed to consider Zane's best interest, particularly regarding the "love, affection and emotional ties existing between the parents . . . and the child." *See* Tenn. Code Ann. § 36-6-106(a)(1). We disagree. The trial court expressly found that the permanent parenting plan "makes adequate and sufficient provision for the custody and maintenance of [Zane]. . . [and] is in [his] best interest." The court further found that Husband and Wife "are unable to effectively make joint decisions regarding . . . Zane." The trial court did not make specific findings regarding each of the applicable statutory factors. On our review of the evidence in light of the factors, however, we cannot say that the evidence preponderates against the trial court's custody determination.

At trial, Zane's therapist, Ms. Smith, supported the proposed parenting plan submitted by Wife. She testified the plan "gives both parents ample opportunity to have a relationship with the child, but it decreases some of . . . the waffling back and forth which is causing a lot of anxiety in Zane." She believed that it was beneficial for Zane to spend more time with Wife, where he was involved in more extracurricular activities and social outings. She supported decreasing Husband's parenting time by one afternoon a week because Zane expressed anxiety and some fear about the time he spent with Husband because of Husband's "excessive rules and odd behaviors." She added that Zane was fearful "about the unpredictability of [Husband's] behavior. . ." and was not comfortable at Husband's home. She advocated that Zane be allowed to consistently participate in extracurricular activities he choses without interruption or interference by either parent. Ms. Smith generally concluded that Zane "has better opportunity to develop in a healthy way with less anxiety at [Wife's] home."

Dr. Millington expressed her view that, respecting custody decisions, "good" parents should be loving, give their best, teach the child, and make them comfortable. She felt both parties were capable of doing these things for Zane. On questioning, Dr. Millington testified that she was not in a position to disagree with the parenting plan proposed by Wife or with Wife being made the primary custodian. She testified, however, that Zane reported he was "more comfortable" with Wife and expressed no concerns about her or her rules.

As we have recognized:

> Divorce affects children profoundly by undermining their sense of stability and well-being. Thus, custody and visitation arrangements are among the most important decisions confronting a trial court in a divorce case. The needs of the children are paramount; while the desires of the parents are

secondary. Custody should never be used to punish or reward the parents, but rather should promote children's best interests by placing them in an environment that will best serve their physical and emotional needs.

*Gaskill*, 936 S.W.2d at 630 (internal citations omitted). In the present case, the proof generally showed that Zane loved both parents, and both were capable of caring and providing for him. At the same time, the proof indicates that Zane had a great deal of anxiety, some of which was attributed to Husband's "rules" at home and his "unpredictable" behavior. For his part, Husband said he had heard the counselor and doctor describe the anxiety Zane felt about him, but he did not know its cause and couldn't get Zane to discuss it with him. Although both parties made themselves available to spend time with the child, the proof suggested that Husband mostly played with him, while Wife took responsibility for taking Zane to medical appointments and counseling sessions, and for arranging for him to be tutored at school when he struggled in math.

The evidence does not preponderate against the trial court's custody decision. The trial court did not err with respect to the permanent parenting plan.

V.

A.

Husband asserts that the trial court erred in finding him to be voluntarily underemployed. The gist of his argument is that Wife had the burden of proof as to this allegation, and she presented "no evidence" of Husband's voluntary underemployment. Husband contends that he, on the other hand, presented "overwhelming" evidence of his efforts to find a higher paying job. In a related issue, Husband asserts that the trial court erred in imputing to him a monthly income of $6,608.75 for the purpose of calculating his child support obligation. He contends that the figure was improperly derived solely by exaggerating the income he earned on a temporary job several years before trial. In this section, we address both issues in turn.

With respect to Husband's income and child support obligation, the trial court found as follows:

Wife's monthly income is $2,335.44. Husband is voluntarily underemployed. Husband's imputed gross income is $6,608.75 per month.

-10-

\* \* \*

> Husband shall pay $898.00 per month to [W]ife in child support in accordance with the Child Support Worksheet accompanying the Permanent Parenting Plan . . . .

## B.

Whether a parent is voluntarily unemployed or underemployed and the amount of his potential income are questions of fact. In resolving them, a trial court must give careful consideration to all the attendant circumstances. ***Eldridge v. Eldridge***, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002); ***Willis v. Willis***, 62 S.W.3d 735, 738-39 (Tenn. Ct. App. 2001).

Tennessee's Child Support Guidelines set out a list of factors a court may consider when determining willful and voluntary unemployment or underemployment. They include:

> (I) The parent's past and present employment;
>
> (II) The parent's education, training, and ability to work;
>
> (III) The State of Tennessee recognizes the role of a stay-at-home parent whether there should be any imputation of income to a stay-at-home parent, the tribunal shall consider:
>
>> I. Whether the parent acted in the role of full-time caretaker while the parents were living in the same household;
>>
>> II. The length of time the parent staying at home has remained out of the workforce for this purpose; and
>>
>> III. The age of the minor children.
>
> (IV) A parent's extravagant lifestyle, including ownership of valuable assets and resources (such as an expensive home or automobile), that appears inappropriate or unreasonable for the income claimed by the parent;

(V) The parent's role as caretaker of a handicapped or seriously ill child of that parent, or any other handicapped or seriously ill relative for whom that parent has assumed the role of caretaker which eliminates or substantially reduces the parent's ability to work outside the home, and the need of that parent to continue in that role in the future;

(VI) Whether unemployment or underemployment for the purpose of pursuing additional training or education is reasonable in light of the parent's obligation to support his/her children and, to this end, whether the training or education will ultimately benefit the child in the case immediately under consideration by increasing the parent's level of support for that child in the future;

(VII) Any additional factors deemed relevant to the particular circumstances of the case.

Tenn. Comp. R. & Regs., ch. 1240-2-4-.04(3)(a)(2)(iii)(I)-(VII).

This Court has further observed:

When called upon to determine whether a parent is willfully and voluntarily unemployed or underemployed, the courts will consider the factors in Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(d)(2) [(2005)], as well as the reasons for the party's change in employment. If a parent's reasons for working in a lower paying job are reasonable and in good faith, the court will not find him or her to be willfully and voluntarily underemployed. The courts are particularly interested in whether a parent's change in employment is voluntary or involuntary, and are more inclined to find willful and voluntary underemployment when a decision to accept a lower paying job is voluntary.

***Richardson v. Spanos***, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005).

In the present case, at a July 2011 motion hearing, the trial court found that Husband was voluntarily *unemployed*. At that time, Husband had not worked for over a year, since a three-month stint as a census taker in the summer of 2010. At the hearing, Husband

-12-

admitted his Tennessee engineering license was "inactive" and he was unsure of the status of his license in Virginia. Husband admitted that he was capable of being gainfully employed full-time. The court expressly advised Husband, "And if you were employed other than as an engineer you'd be voluntarily *underemployed*." (Emphasis added.)

At trial, Husband testified that after the Cyprus Foote plant was relocated, he had potential opportunities to remain with the company in another state. He said he didn't pursue them because Wife "just couldn't handle" the idea of moving away. Husband said he was unable to find another engineering job near home and the market had gone "flat." Father gave a brief account of his ensuing work history as follows:

> You know, there's only so many options I can provide when I'm an engineer. We . . . often get moved around a lot. We . . . might work 100 hours one week and might be out of work the next because we finished a project.
>
> When I was at Cyprus Foote I . . . averaged 80 hours a week for five years. . . . I was out there seven days a week and I was just perpetually exhausted.
>
> *     *     *
>
> I don't think anyone's going to say that I'm not willing to work, not willing to work hard. I did it until we got married and I had no choice because it was either file for divorce . . . or do something else. And what I decided to do is design a business, a small civil engineering firm that did residential developments primarily and allowed us to stay here in this area.
>
> *     *     *
>
> And then . . . I started taking care of Zane and residential development started dropping off. I averaged just a few thousand [dollars] after 2001 until I took this temporary job . . . with Think Resources . . . in 2006. And I was told it would probably last for three months. What I did was I worked intermittently for approximately 5 and a half months and they could lay me off, bring me back anytime they wanted to.
>
> *     *     *

-13-

So the bottom line is we [engineers] got no job security.

\* \* \*

[T]he point I'm making is if anyone portrays me as being lazy or not wanting to work . . . , it's nothing but a . . . 100 percent blatant false portrayal of me because I've been a workaholic most of my life and I still like to work hard.  And I just like to be with my son too.  That's the one . . . luxury I offered myself in life is to spend time with my son. . . .

Husband introduced his social security earnings statement.  It reflected that, during 1994-1999, Father earned an average of $10,965 a year.  After the Child was born, from 2000 - 2008, Husband's average yearly earnings dropped to $4,990.

It is undisputed that Husband worked as an engineer in the past and has the education, training and ability to continue to work in his chosen field.  The proof indicated that, as with the Cyprus Foote job, the end of his most recent engineering job was not by Husband's choice. This does not end the inquiry, however.  "The term 'willfully and voluntarily' implies a choice. While the initial loss of employment may have been involuntary, an obligor's course of action and decision-making after termination can demonstrate willful and voluntary underemployment." ***Ralston v. Ralston***, No. 01A01-9804-CV-00222, 1999 WL 562719 at *4 (Tenn. Ct. App. M.S., filed Aug. 3, 1999).   Instead of actively pursuing engineering work, Husband, in the two years after the divorce filing, worked only sporadically, and in short-term or part-time jobs that utilized none of his considerable education, skills or experience.  While he testified to pursuing at least 100 jobs online, he agreed that he had submitted only seven written job applications in that time.  By the time of trial, Father had secured part-time work at Walmart.  In short, we fail to see "overwhelming evidence" of Husband's efforts to find engineering work with commensurate pay.

Our review leads us to conclude that Wife carried her burden of proof on this issue.  Again, the determination of whether a parent is willfully and voluntarily underemployed is a question of fact, and "the trial court has considerable discretion in its determination." ***Willis***, 62 S.W.3d at 738.  The trial court did not abuse its discretion in finding Husband to be voluntarily underemployed.

C.

Husband asserts that the child support payments he has been ordered to pay based on his imputed income "put [him] on a path to indigence based on [his] current income and current parenting plan." In response, Wife argues that Husband's imputed income was properly calculated based on the "only reliable evidence as to the income Husband could earn as an engineer."

The trial court did not explain its finding concerning the amount of the income imputed to Father. On our review of the record, however, it appears that the method of calculation is "readily ascertainable." *See Rogin v. Rogin*, No. W2012-01983-COA-R3-CV, 2013 WL 386995 at *8 (Tenn. Ct. App. M.S., filed July 10, 2013)("when faced with a trial court's failure to make specific findings, the appellate courts may 'soldier on' . . . when the court's decision is 'readily ascertainable.' ")(quoting *Burgess v. Kone, Inc.*, No. M2007-0259-COA-R3-CV, 2008 WL 2796409, at *2 (Tenn. Ct. App. July 18, 2008)). We thus proceed with our review.

First, under the Child Support Guidelines, the trial court may impute income under certain limited circumstances. *Id.* (citing *Goodman v. Goodman*, No. W2011-01971-COA-R3-CV, 2012 WL 1605164, at*4 (Tenn. Ct. App. May 7, 2012); *see also* Tenn. Comp. R. & Regs. ch. 1240-2-4-.04(3)(a)(2)(i)(I-III). In relevant part, the Guidelines provide that "[i]mputing additional gross income to a parent is appropriate . . . [i]f a parent has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed." Tenn. Comp. R. & Regs., ch.1240-2-4-.04(3)(a)(2)(i); *Goodman*, at *4.

"The fairness of a child support award depends on an accurate determination of both parents' gross income or ability to support." *Rogin*, at *5 (quoting *Massey v. Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009)). With regard to Husband's gross income, it is clear to us that the trial court implicitly accepted Wife's analysis and calculations when it imputed to him a monthly income of $6,608.75. At trial, Wife explained that she calculated Father's imputed income based on his earnings for engineering work he performed for Think Resources, Inc., during a 4-month period during 2006 and 2007. Father's W-2 forms reflect that he earned $18,479 in 2006 and $7,956 in 2007 on that job. Wife's testimony was that Father worked over a 5-month period, but was unpaid for four weeks due to time off during the holidays. Accordingly, Wife divided the total income ($26,435) by four, representing the number of months worked, to reach an average monthly income of $6,608.75. For his part, Husband did not dispute his earnings as reflected on the tax forms. He testified, however, that he worked for Think Resources for about 5 ½ months, only a "few days" of which were unpaid. He did not give details or directly dispute Wife's contention that he began the job in October 2006 and left in February 2007. Husband did not recall telling Wife he actually

-15-

worked a total of four months. Husband further testified that he knew from the start that the job was temporary, as did Wife. As a result, Husband claimed he was paid a higher rate because he could be called in or off the job at any time and he received no benefits.

Husband essentially argues that it is not reasonable to use the limited earnings he received on a temporary project as the basis for imputing additional income to him. To some extent, he asserts that the trial court erroneously imputed additional income to him because, as he puts it, the resulting child support payments "put [him] on a path to indigence based on [his] current income and current parenting plan. . . ." On this point, Husband's argument is not persuasive. "A party's child support obligation is not measured by his or her actual income but rather by his or her potential income as evidenced by his or her educational level and previous work experience." Tenn. Comp. R. & Regs. ch. 1240-2-4-.04(2)(ii)(I - II); *Watters v. Watters*, 22 S.W.3d 817, 820-21 (Tenn. Ct. App. 1999).

As we see it, the real question in the present case is whether the *amount* of the income imputed to Husband was correctly calculated. A parent's potential income is a question of fact. *Willis*, 62 S.W.3d at 739. Looking at the relevant factors, Husband has a double engineering degree and some credit hours towards a master's degree in engineering. During the marriage, he performed engineering work for his own business and for two employers. Most recently, he worked for Think Resources. Some eighteen years earlier, he worked steadily as a plant manager earning about $47,000 a year.

The trial court implicitly found, and we concur, that the more recent, albeit temporary employment, is the best evidence of Husband's earning potential at or near the time of the divorce proceeding. The evidence does not preponderate against the trial court's finding that Husband is capable of earning a gross income of $6,608.75 per month.

VI.

Husband asserts that the trial court erred in concluding that he committed inappropriate marital conduct as the basis for awarding Wife a divorce. As Husband sees it, his imposition of "energy and water conservation rules in the marital home" is not marital misconduct – it is nothing more than a "difference of opinion on whether or not to run the household in a conservant manner. . . ."

In support of its judgment, the trial court found that "Husband engaged in inappropriate marital conduct when he imposed upon Wife, over her objections, stringent rules regarding her conduct and her use of the marital home and property." We need not reiterate all of the "rules" the parties testified to at trial. Suffice it to say that Wife expressed that she was not comfortable in her own home as a result of Husband's efforts to conserve

electricity and water. As she put it, it was not a "normal" home. Wife testified that Husband ignored her protestations and called her names. Husband offered little to contradict Wife's testimony about the family's living conditions. Nor did he dispute that he was aware of Wife's disagreement with the rules and the discomfort she felt. Husband testified that Wife was simply "outvoted," particularly regarding the thermostat settings.

Tenn. Code Ann. § 36-4-101(11) provides a cause for divorce when a "husband or wife is guilty of such cruel and inhuman treatment or conduct towards the spouse as renders cohabitation unsafe and improper, which may also be referred to in pleadings as inappropriate marital conduct." Essentially, inappropriate marital conduct is when "either or both of the parties [have] engaged in a course of conduct which (1) caused pain, anguish or distress to the other party and (2) rendered continued cohabitation 'improper,' 'unendurable,' 'intolerable,' or 'unacceptable.' " *Eldridge,* 137 S.W.3d at 24 (quoting *Earls v. Earls*, 42 S.W.3d 877, 892 (Tenn. Ct. App. 2000)).

In the present case, the evidence preponderates strongly in favor of the trial court's decision to award Wife a divorce on the ground of inappropriate marital conduct. The trial court heard both parties' testimony and implicitly found that by his insistence on strict adherence to his conservation policies and measures, Father engaged in "a course of conduct which warranted a finding that Father was more at fault for the demise of the marriage." *Chaffin v. Ellis*, 211 S.W. 3d 264, 289-90 (Tenn. Ct. App. 2006). The evidence does not preponderate against the trial court's finding of Husband's inappropriate marital conduct.

VII.

As we understand his argument, Husband contends that the trial court erred by entering a judgment that did not or does not resolve all issues regarding the division of the marital property. Husband's entire argument is as follows:

> There was an approximate difference of $60,000 between [Husband's] and [Wife's] marital asset division proposals [filed in the trial court].
>
> There was no legal description in said Judgment of Divorce of how to divide the marital assets, and failed attempts have already been made [to] divide the assets.

At trial, Wife proposed that the marital estate be equally divided between the parties. Under her proposal, Husband was awarded the marital home and the adjacent lot, the marital portion of his IRA, a patent he owned, household goods, the balance in his checking account,

and lawn equipment; he was also assessed one debt, a $345 credit card balance. Husband's net award was $180,938.41. Wife was awarded her IRA, the timeshare condominium, her mutual fund, her pension fund, her savings and checking account balances, the 1997 Toyota car she drove, and household goods. Wife was assessed with debts of $25,709.53, including four credit cards, and a loan from her father for rent. Wife's net award was $78,534.41. Both parties were awarded their separate property, which is not in dispute. Wife's plan further provided for an "equalizing payment" of $51,202 from Husband to Wife in order to achieve an overall "50/50" division of the marital estate – a net award of $129,736.41 to each party.

The trial court approved the plan and incorporated it into the divorce judgment. In support of its decision, the trial court expressly considered the factors applicable to an equitable property division as set forth in Tenn. Code Ann. § 36-4-121(c). The trial court concluded that "Wife's proposed property division is equitable, considering all of the circumstances." The court ordered (1) that the "marital assets and debts shall be divided as shown" and (2) that Husband transfer $51,202 to Wife within thirty days of the date of entry of its judgment.

The record reflects that the trial court's judgment, entered some four months after trial, effectuated the division of the marital estate. The trial court did not prematurely enter judgment by failing to dispose of any remaining issues. We conclude that any perceived difficulty in carrying out the court's judgment is not a basis for entry of the "new" marital asset division that Husband proposes. At the same time, we understand Husband's concern that the "Judgment require[s] [Husband] to transfer a settlement amount without a transfer of real property." More specifically, the judgment requires Husband's "equalizing payment" to be made to Wife within thirty days of entry of judgment, but does not address the time frame in which Wife is to execute a deed conveying her interest in the former marital home to Husband. To this, end we amend the judgment to provide that the parties shall effectuate both the transfer of the marital home to Husband and the equalizing payment to Wife within thirty days of the date judgment is entered. The respective transfers will be made simultaneously. The judgment is otherwise affirmed in all respects.

VIII.

Husband challenges the trial court's award of a portion of attorney's fees and expenses to Wife. He asserts that Wife and her attorneys filed "legally deficient documents" and took other actions that were deliberately intended to increase Wife's legal fees. He points, for example, to Wife's failure to include a statement verifying that her proposed temporary parenting plan was consistent with the previous plan; the "exaggeration" of Husband's presumed income, "possibly to a point of perjury, by manipulating W-2 forms

from [his] temporary employment"; her "refusal" to mediate Husband's pretrial request to reduce his child support payments; and failure to hand-deliver the judgment of divorce to Husband as alleged in the certificate of service. In addition, Husband lists several "deficiencies" with the judgment itself, which he contends is an "illegal one-sided contract." Lastly, Husband contends Wife's counsel caused her to incur unnecessary fees by proposing an initial temporary parenting plan covering three months rather than a year, by continuing the trial, and by having multiple attorneys at trial.

As ordered, Wife's attorney submitted an affidavit setting out the fees and expenses incurred by Wife in the divorce case. From November 2009 through May 2012, fees for legal services rendered to Wife totaled $62,635, and expenses totaled $1,414.71. In that time, Wife's counsel, Ms. Singleton, spent nearly 230 hours working on the case. She attended four mediations, and responded to more than 30 pre-trial motions Husband filed on his own behalf. The record contains duplicative motions addressing matters which were previously ruled on. As examples, although the parties lived together with Zane until the time Wife filed her complaint for divorce, Husband filed multiple motions objecting to the temporary parenting plan as a "reversal" of the "parenting schedule" that had been in effect during the marriage. He filed numerous other motions alleging that Wife and her counsel committed "perjury" in connection with the income they imputed to him to calculate his child support payments. On one occasion, Wife and her attorney appeared at a hearing on one of Husband's motions, but Husband failed to appear. Further legal services were rendered to Wife in connection with her motion to hold Husband in contempt when he refused to pay child support as agreed to in mediation. Certainly, Wife incurred fees and expenses in prosecuting her complaint to and through the trial. On our review of the entire record, however, we find nothing to support Husband's claim that Wife and/or her counsel acted improperly and with a goal to run up Wife's legal bills.

In support of its award of $16,413.71 in attorney's fees to Wife, the trial court stated:

> Husband's conduct throughout this litigation – including his filing of duplicative and frivolous motions, his failure to comply with the Court's orders, and his failure to appear at one of his own motions [hearings] – caused [Wife] to unnecessarily incur substantial attorney's fees and costs. If Wife were to bear the full amount of her attorney's fees and costs, her standard of living and her minor child's standard of living would be materially adversely affected. Thus, an award of attorney's fees and costs to Wife is necessary for the adequate support of Wife and the parties' minor child.

-19-

In the context of a divorce case involving child custody matters, attorney fees are awarded "in the discretion of [the] court" with some limitations. ***Miller v. Miller***, 336 S.W.3d 578, 586 (Tenn. Ct. App. 2010); Tenn. Code Ann. § 36-5-103 (c)(2005).[3] We review for an abuse of discretion. *See, e.g.,* ***Elliot v. Elliot***, 825 S.W.2d 87, 92 (Tenn. Ct. App. 1991). The amount must be reasonable, and the fees must relate to issues of custody or support as opposed simply to dissolution of the marriage. Tenn. Code Ann. § 36-5-103(c). The attorney's work in securing the award must ultimately inure to the benefit of the minor children. ***Dalton v. Dalton***, 858 S.W. 2d 324, 327 (Tenn. Ct. App. 1993).

Based on our review of the entire record, we conclude that the trial court was within its discretion in awarding a portion of Wife's attorney's fees. Detailed statements submitted by Wife's counsel reflect that counsel devoted a considerable amount of time to child custody and child support. Moreover, Wife testified that during the pendency of the divorce, it got to the point that she was paying more in attorney fees than she earned each month. She got by with help from her father, and she owed him $9,000 in past rent.

The trial court applied appropriate legal principles and was within its discretion in awarding a reasonable amount of attorney's fees to Wife. We therefore uphold the award.

IX.

The judgment of the trial court is affirmed as modified with respect to Wife's obligation to transfer her interest in real property to Husband. Costs on appeal are taxed to the appellant, William Grant Sitz. This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and for collection of costs assessed by the trial court.

---

[3]The statute provides:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE